IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

TRACY WILBURN,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          ) Case No. 08-0430-CV-REL-SSA
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social            )
Security,                         )
                                  )
            Defendant.            )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This suit involves an application for Supplemental Security
Income (SSI) benefits under Title XVI of the Social Security Act
(the Act), 42 U.S.C. §§ 1381, *et seq.* (Tr. 100-02). Section
1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for
judicial review of a "final decision" of the Commissioner of the
Social Security Administration.

Plaintiff's application for benefits under Title XVI was
denied initially (Tr. 29-37). On July 21, 2006, following two
hearings, an administrative law judge (ALJ) rendered a decision
in which he found plaintiff was not under a "disability" as
defined in the Social Security Act (Tr. 18-28). On May 14, 2008,
the Appeals Council of the Social Security Administration denied
plaintiff's request for review (Tr. 9-11). Thus, the decision of
the ALJ stands as the final decision of the Commissioner.
Plaintiff previously filed an application under Title XVI that
was denied initially on August 22, 2002, and was not further

pursued (Tr. 21-22). Because the current action was filed within one year of the notice of the initial determination, the ALJ reopened the prior determination (Tr. 22). *See* 20 C.F.R. § 416.1488(a) (2008).

## I.    BACKGROUND

Plaintiff filed her application for SSI benefits on May 28, 2003 (Tr. 100). She was born in 1965 and allegedly became disabled beginning April 26, 2001 (Tr.100). Plaintiff's disability stems from right shoulder problems (Tr. 112).

The general issues in a Social Security case are whether the final decision of the Commissioner is consistent with the Social Security Act, regulations, and applicable case law, and whether the findings of fact are supported by substantial evidence on the record as a whole. The specific issues in this case are whether the ALJ properly evaluated plaintiff's mental impairment, whether the ALJ made a proper credibility determination, whether the ALJ properly evaluated the medical opinions of record, whether the ALJ properly relied upon the vocational expert's testimony in finding plaintiff could perform a significant number of jobs that existed in the national economy, and whether the Agency followed proper hearing procedure.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The

2

standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either

3

way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

***III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS***

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   *THE RECORD*

The record consists of the testimony taken during two administrative hearings and the documentary evidence admitted at the hearings.  The facts are largely a matter of stipulation between the parties.[1]

## A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative documents:

---

[1]See Brief for Defendant, page 2.

Plaintiff's summary of FICA earnings reflects the following income for the years indicated:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1981 | $ 583.02 | 1994 | NONE |
| 1982 | $ 523.88 | 1995 | NONE |
| 1983 | $ 95.43 | 1996 | NONE |
| 1984 | NONE | 1997 | NONE |
| 1985 | $ 891.56 | 1998 | NONE |
| 1986 | $1,158.90 | 1999 | NONE |
| 1987 | $ 70.35 | 2000 | $4,193.23 |
| 1988 | $ 107.60 | 2001 | $4,390.51 |
| 1989 | NONE | 2002 | NONE |
| 1990 | NONE | 2003 | NONE |
| 1991 | NONE | 2004 | NONE |
| 1992 | NONE | 2005 | NONE |
| 1993 | NONE | 2006 | NONE |

(Tr. 103-06). Summarizing, plaintiff earned a total of $12,014.48 over a 26-year period; an average of $462.09 per year.

On June 2, 2003, plaintiff completed an Application for Supplemental Security Income and represented that she was born in 1965; is married to Brian Wilburn; lives in Claycomo, Missouri; owns a vehicle; and receives AFDC payments of $292.00 a month plus food stamps(Tr. 100-02).

On June 6, 2003, plaintiff completed a Disability Report - Adult in which she identified her right shoulder as being the problem that led to her disability (Tr. 112-20).

6

Plaintiff stated that she has limited use of her right arm to the extent that she can pick up small objects and write for very short periods of time, e.g., one or two sentences (Tr. 112). The condition began on March 28, 2001, and led to her being unable to work on April 26, 2001 (Tr. 113). Plaintiff indicated that she stopped work due to the pain and because she could not hold objects (Tr. 113). Plaintiff reported that during the past 15 years, she worked at three jobs: cashier at a cafeteria from September 2000 until April 28, 2001; housekeeper at a motel for one month in 1985; and receptionist at a medical office for two months in 1986 (Tr. 113).

On June 24, 2003, plaintiff completed a Claimant Questionnaire Supplement (Tr. 124-30). In that document, plaintiff stated that she walks 30 minutes for exercise, writes five lines with pain, and does 20 leg lifts per day (Tr. 124). Plaintiff indicated that she has no problem sitting; can stand for 15 minutes and walk for 30 minutes; can lift only with her left hand and can use her right hand for two to five minutes; cannot bend, kneel or squat; can climb stairs but it causes swelling in her lower back; can reach forward and backward about five times; and cannot reach overhead due to pain and pinching (Tr. 124). Plaintiff represented that her pain is constant when it rains but that she has no pain when it is warm unless she engages in movement or repetitive motion (Tr. 124). Plaintiff

7

identified the cause of her inability to work as tendinitis in the shoulder (Tr. 125).

As to daily activities, plaintiff indicated that she can do nothing other than laundry, which presents a problem with carrying the laundry baskets (Tr. 127).  Plaintiff represented that she can shop for about 30 minutes with help, and she can make small meals (Tr. 128). In an average day, plaintiff takes a shower, exercises, helps with laundry and cooking, and watches television (Tr. 128).  Plaintiff indicated that she has a license to drive but has been advised by Dr. Aspinwall not to drive because it causes pain (Tr. 129). Plaintiff indicated that she has no problem following written or verbal instructions, does not need reminding to complete chores, and has no problem getting along with others (Tr. 129-30).

On March 10, 2005, plaintiff listed her current medications and their side effects:

| Medication | Side Effects | Reason |
|---|---|---|
| Zanaflex[2] | Slowed reaction | Pain |
| Vicodin[3] | Wake up | Pain |
| Neurontin[4] | Memory/Confusion | Nerves |
| Zertec D | Dry mouth | Allergies |
| Singulair | None | Asthma |
| Prilosec | None | Stomach acid |

---

[2]A short-acting muscle relaxer.

[3]A narcotic.

[4]An anti-epileptic medication.

8

(Tr. 133).

On March 10, 2005, plaintiff completed a Claimant's Work
Background (Tr. 136) listing her employment history for the past
15 years as follows:

| Date | Employer | Job | Reason left |
|------|----------|-----|-------------|
| 09/11 – 06/01 | Ford | Cashier | Disability |
| 1988 – 09/00 | Homemaker | | |
| 1988 | Dr. Mize | Receptionist | Pregnancy |
| 1986-87 | Interstate Inn | Housekeeper | Other job |
| 1980-81 | Worlds of Fun | Arcade attendant | School |

On August 24, 2005, plaintiff was evaluated by Michael J.
Dreiling, Vocational Consultant, and from this evaluation Mr.
Dreiling issued his report dated August 30, 2005 (Tr. 139-148).
As part of Mr. Dreiling's evaluation, he reviewed some of
plaintiff's medical records, interviewed plaintiff, and conducted
vocational testing. Mr. Dreiling reviewed medical records from
three sources: John R. Tait, M.D. (February 25, 2004, discharging
plaintiff from clinic with "unresolved myofacial pain syndrome of
the right arm and shoulder, with limited shoulder range of
motion"); Eric Aspinwall, M.D. (November 8, 2002, observing that
plaintiff had made some progress but her prognosis was guarded
and she was unable to work); and Fernando M. Egea, M.D. (April
12, 2004, finding that plaintiff suffers from chronic Rotator
Cuff tendinosis of the right and left shoulders, worse in the
right; and concluding plaintiff had partial and permanent

9

disabilities) (Tr. 139-140).  Mr. Dreiling administered the
Wonderlic Personnel Test to plaintiff, which tests general
cognitive ability, and found that she tested below the average
score, which "would be fairly consistent with the type of work
that this individual has performed in the labor market since
quitting high school after the 11th grade" (Tr. 146).
Specifically, Mr. Dreiling stated:

> Presently, she does not appear to be an appropriate
> candidate for pursuing any further academic or vocational
> training, as long as she experiences the chronic pain issues
> and functions at the level as previously described, in terms
> of her day in and day out activities.

(Tr. 146.)

From this evaluation, Mr. Dreiling expressed his opinion
that considering plaintiff's age, educational background, work
history, and physical condition that there would be no jobs that
she could perform (Tr. 147). Mr. Dreiling indicated that because
of plaintiff's chronic pain issues affecting her dominant upper
extremity and her overall physical functioning on a daily basis,
no employer would be reasonably expected to employ her (Tr. 147).

On March 21, 2006, plaintiff updated her Claimant's Current
Medications by adding Capzasin,[5] a pain medication which she
reported burns her skin (Tr. 150).

---

[5]Capzasin topical causes a decrease in a substance in the
body (substance P) that causes pain. Capzasin topical is used to
relieve minor aches and pains of muscle and joints associated
with arthritis, simple backache, strains, and sprains.

**B.   SUMMARY OF MEDICAL RECORDS**

On April 3, 2001, plaintiff was seen at Business and Health Industry for a workers' compensation injury to her left hand and wrist arising from a fall at work when plaintiff was carrying trays (Tr.  300).

On April 25, 2001, she was seen at Business and Health Industry.  While indicating that her left wrist was doing better, plaintiff complained of right wrist pain and numbness (Tr. 292). Plaintiff said the right wrist pain shoots up to her elbow. Plaintiff indicated that she bought an <u>elbow</u> strap that decreases her pain in her right <u>wrist</u>.  On examination, both wrists were normal, although the right elbow was tender to touch.  The provider informed plaintiff that the elbow strap was for the elbow and did nothing for her right wrist problem.  The provider recommended that plaintiff continue a home exercise program for both wrists (Tr. 293). Plaintiff was returned to regular work that day (Tr. 302).

On April 30, 2001, plaintiff went to the Clay County Health Department (CCHD) and was diagnosed with right elbow and wrist pain (Tr. 327). The attending physician noted a positive Tinel's sign[6] as well as a positive Phalen's sign[7] (Tr. 327).  Plaintiff

_____

[6]Tinel's sign is a way to detect irritated nerves. It involves lightly tapping over a nerve to elicit a sensation of tingling or "pins and needles."

[7]Phalen's sign is a test for carpal tunnel syndrome.

Case 4:08-cv-00430-REL   Document 22   Filed 09/03/09   Page 11 of 77

was told to avoid mobilization or over use and repetitive movements for a week to ten days, she was prescribed Ibuprofen 600 mg, and she was told to use heat packs three times a day for 15 minutes each time (Tr. 327).

On May 25, 2001, plaintiff was seen at CCHD for right elbow and left wrist pain and hand numbness (Tr. 326). The physician diagnosed plaintiff with possible epicondylitis[8] in her right elbow and possible carpal tunnel syndrome[9] (Tr. 326). The doctor's plan was to have an orthopedic consult for evaluation and management (Tr. 326).

**April 26, 2001, is plaintiff's alleged onset of disability.**

On May 18, 2001, plaintiff went to the emergency room at North Kansas City Hospital complaining of tendonitis in her right elbow (Tr. 305-14). Plaintiff complained that the problem had been ongoing for about three weeks and that she was "fighting with work whether it truly [was] work related" (Tr. 307). The history reflects that plaintiff had already seen a physician at one point about the right elbow and received a steroid injection (Tr. 307). Plaintiff was placed in a sling, told to apply ice to the elbow, and directed to see her treating doctor for a follow-up visit (Tr. 307).

---

[8]Epicondylitis is an inflammation of an epicondyle, and is also known as tennis or golf elbow.

[9]Carpal tunnel syndrome is a condition in which the median nerve is compressed at the wrist.

12

On June 1, 2001, plaintiff was seen at CCHD (Tr. 324). Plaintiff was assessed as having left carpal tunnel and right parasthesia[10] R/O [rule out] carpal tunnel.

On July 16, 2001, plaintiff was seen at the orthopaedic clinic, Truman Medical Center (Tr. 375-76). The doctor noted in part that he could not test Phalen's because plaintiff had a cock-up wrist splint on the other side. Plaintiff's Tinel's signal caused intense pain "which seem[ed] to be out of proportion to her complaints." Plaintiff showed decreased sensation to light touch along the radial three digits and she stated that all fingertips sometimes get numb. The doctor indicated that he wanted to get an electromyogram[11] because "this could be coming from her neck." Plaintiff was mildly tender to palpation along the lateral epicondyle (elbow) but it did not seem to be as much of a problem as plaintiff's shoulder. The doctor injected plaintiff with Lidocaine[12] and Marcaine,[13] which improved her arc of motion. After the injection, plaintiff had no pain with abduction to 90 degrees and internal rotation. The

---

[10]Paresthesia is a skin sensation (e.g., burning, tingling or pin pricks) with no apparent physical cause.

[11]Electromylogram (EMG) is a device used to evaluate and record the activity of muscles.

[12]Lidocaine is a common local anesthetic used to relieve pain, itching and burning from skin inflammations.

[13]Marcaine is a local anaesthetic injected to reduce pain.

13

doctor opined that this improvement might indicate a soft tissue pathology.

On June 18, 2001, plaintiff was seen at the orthopaedic clinic at Truman Medical Center (Tr. 380-81). The doctor observed that plaintiff showed 5/5 strength in upper and lower extremities, had normal sensation in upper and lower extremities, and had no Hoffmann's signs[14] bilaterally. Plaintiff's left wrist had some pain. Plaintiff had a negative Phalen's test. Plaintiff had some minor pain in her right elbow, "5/5 strength of her right and with wrist flexion and extension and her osseous muscle testing" (Tr. 380). Plaintiff was released to work with the proviso that she have no repetitive motions of both her upper extremities.

On August 9, 2001, plaintiff went to North Kansas City Hospital complaining about right shoulder pain for the past three months (Tr. 454-55). Plaintiff was noted to be a smoker. Plaintiff was diagnosed with right shoulder pain.  She was given IM Toradol[15] and was told to follow up with Workers' Compensation and her doctor.

_____

[14]Hoffmann's sign is a finding elicited by a reflex test that verifies the presence or absence of problems in the corticospinal tract; Hoffmann's sign is also known as finger flexor reflex.

[15]Toradol is a non-steroidal anti-inflammatory drug (NSAID).

14

On August 20, 2001, plaintiff went to Truman Medical Center (Tr. 342). Erich Jurgen Lingenfelter, M.D., who was with the orthopedic clinic, indicated that an EMG (electromylogram) was ordered and plaintiff was unable to tolerate the procedure but, from what they could get, the results were normal. Examination showed tenderness to palpation along the posterior trapezius musculature, painful arch starting at 90 degrees of abduction and forward flexion, internal and external rotation was painless, and she had good strength. Cervical spine x-rays were unimpressive. The doctor wrote, "She is a very difficult person to examine, has litigation issues, and keeps referring to 'overuse' syndrome which she incurred at work. Nevertheless, I am obligated to investigate this." The doctor planned to get a magnetic resonance imaging scan of plaintiff's right shoulder.

On September 4, 2001, plaintiff went to CCHD and was assessed as having bilateral carpal tunnel and right lower extremity radiculopathy[16] (Tr. 413).

On September 14, 2001, plaintiff went to Truman Medical Center (Tr. 339). Plaintiff was instructed to continue her pain medication. The provider indicated that plaintiff "did not have the MRI [magnetic resonance imaging] - as ordered" and that plaintiff had smoked 1 pack of cigarettes per day for 21 years.

---

[16]Radiculopathy is a problem in which one or more nerves are affected and do not work properly, and can result in pain, weakness, numbness, or difficulty controlling muscles.

On September 24, 2001, plaintiff had an MRI performed at Truman Medical Center which showed mild disc desiccation (dryness) at level L5-S1 but otherwise unremarkable MRI of the lumbar spine (Tr. 257, 1006). She also had an MRI of her right shoulder which showed mild tendinosis (Tr. 358, 1007). There was a small amount of fluid around the supraspinatus[17] tendon, which was compatible with mild peritendinitis. There was no evidence of rotator cuff tear, no large joint effusion, normal bone marrow signal intensity in the osseous (bone) structures, no muscle tear or rupture, and the glenoid labrum[18] appeared intact.

On September 25, 2001, plaintiff went to the CCHD concerning her right shoulder and lower back pain and right lower extremity radiculopathy (Tr. 408). Plaintiff was given an injection of DepoMedrol and Lidocaine (a steroid injection) and showed increased range of motion following the procedure.

On October 5, 2001, plaintiff went to Truman Medical Center and was instructed that "there is no operable lesion on her shoulder or back MRI currently" (Tr. 1003-04). She was offered physical therapy but refused because she claimed physical therapy had worsened her condition (Tr. 1003-04).

---

[17] Supraspinatus is a relatively small muscle of the upper limb. It is one of four rotator cuff muscles and also abducts the arm at the shoulder.

[18] Glenoid labrum is the hip joint.

16

On October 10, 2001, plaintiff went to Truman Medical Center's orthopedic clinic (Tr. 348-49). On examination of plaintiff's right shoulder, the doctor found:

> [A] full range of motion in her shoulder, elbow, and wrist. [Plaintiff] reported some tenderness in the superior part of her shoulder joint to palpation. No crepitus was palpated. She had 5/5 strength with abduction, internal rotation, and external rotation of her shoulder. She also had strength in her hand. The radial median, and ulnar nerves were intact. Sensation was intact in her upper extremity. Back, she was somewhat tender on the left paraspinous region at approximately the L5 level and on the right paraspinous region in the same area. Straight leg test was positive on the right side. Lower extremities showed sensation to be intact. She was able to stand on her heels but was unable to stand on her toes secondary to pain. Deep tendon reflexes were 2 plus and equal bilaterally in the lower extremities. 5/5 strength in her lower extremities except for plantar flexion of the foot, which was 3/5 strength. Hip examination showed full range of motion without pain or tenderness.

(Tr. 348.) Plaintiff's MRI showed

> [M]ild disk desiccation at the level of L5-S1, otherwise, it was an unremarkable MRI of the lumbar spine. There is no evidence of concentric stenosis or neural foramen narrowing. MRI of the shoulder showed a normal exam except for evidence of mild supraspinatus tendinitis and a small amount of fluid around the supraspinatus tendon with mild peritendinitis.

(Tr. 348.)

Plaintiff was offered physical therapy but declined stating that she had done this in the past.

On November 13, 2001, plaintiff returned to the CCHD complaining about pain in her right shoulder, hip, and foot (Tr. 397). The doctor reported that this problem was long standing and without any signs of improvement. Plaintiff indicated that her right anterior hip felt better but she was experiencing

17

significant pain while standing on her right foot or with any kind of shoulder movement.  The doctor referred plaintiff to the Headache and Pain Center for evaluation.

On December 3, 2001, plaintiff went to the CCHD (Tr. 395). Plaintiff received a steroid injection for her low back problem. Plaintiff reported decreased muscle pain and muscle spasm, and overall improvement in her functioning and pain level.

On December 14, 2001, plaintiff received an epidural injection from Excelsior Springs Medical Center (Tr. 489).

On December 18, 2001, plaintiff was seen by David D. Dyck, Jr., D.O., at Clay County Health Center (Tr. 393). The doctor noted that plaintiff had received her third epidural injection on December 14, 2001, and also noted significant improvement throughout.  Plaintiff rated her pain as level 1, and her biggest complaint was muscle soreness. On examination, plaintiff was able to walk slowly with a slight limp to the right side, able to transfer from the chair to a table and from the table to standing without difficulty.  Plaintiff had a positive straight leg raise on the right and had pain with palpation of the sciatic region.[19] Muscle spasm was noted on the right lumbar side and was greater than the left.  Muscle strength on lower extremities was 3-4+ on the right and 4-4+ on the left in all motions of the lower

---

[19]The sciatic nerve is a nerve that begins in the lower back and runs through the buttock and down the lower limb.

18

extremities. Deep tendon reflexes were 3+ over 4 bilaterally for patella (kneecap) and Achilles.

On January 8, 2002, plaintiff went to Excelsior Springs Medical Center and complained about sharp pain from her shoulders to her fingers (Tr. 488).

On January 15, 2002, plaintiff was seen at Excelsior Springs Medical Center complaining of right shoulder pain (Tr. 486).

On February 15, 2002, plaintiff went to Swope Parkway Northland Clinic and was seen by Eric Aspinwall, M.D. (Tr. 434). Plaintiff complained about pain "in various parts of her body," and said she had had MRIs of her lower back and right shoulder. She also reported having had manipulation and had been seen by the Headache and Pain Center in Excelsior Springs.

On March 1, 2002, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall (Tr. 433). This was a follow-up visit for an MRI. Plaintiff reported her back pain as unchanged and radiating to her right leg and all the way down to her foot.

On April 19, 2002, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall about right shoulder and elbow pain and hand numbness (Tr. 427). Plaintiff reported that she started getting pain after cleaning out a refrigerator. She reported that her condition had been getting better until this incident. She reported experiencing this problem in the past and

19

having it resolved by receiving a shot in the shoulder.

On May 3, 2002, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall (Tr. 176). Plaintiff reported that her shoulder was better but still had pain that went into her elbow and hand, and numbness over right 4th and 5th fingers.

On May 28, 2002, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall (Tr. 174). Plaintiff showed tenderness over her right lateral shoulder and forearm. Tinel's sign was positive over her wrist and elbow.

On June 17, 2002, Dr. Fernando Egea treated plaintiff (Tr. 465-67). Plaintiff stated that at that time her left wrist had improved, but her right wrist had continued to worsen (Tr. 465-67). Plaintiff explained that she had overused the right arm heavily as a result of the original injury. The doctor examined plaintiff and reported in part:

> The examination of the posterior aspect of the cervical area
> is normal. Range of motion of the neck is normal, the
> flexion, and extension to 45 [degrees], lateral bending both
> sides to 40 [degrees], and rotation both sides to 70
> [degrees]. Forarneno compression test is negative.
>
> * * * * *
>
> The examination of the thoracic and lumbo-sacral spines is
> normal. Range of motion at the waist is normal, forward
> flexion to 90 [degrees], extension to 30 [degrees], lateral
> bending to 35 [degrees] both sides, and rotation to 30
> [degrees] both sides. SLRs [straight leg raises] are

20

negative bilaterally.  Lasegue's signs[20] are negative both
sides.  Patrick's signs[21] are negative bilaterally.
Strength in the upper and lower extremities is normal
bilaterally.  Range of motion is good.  Muscle bulk and
tones are normal in all the muscles tested.

(Tr. 466.)

Dr. Egea performed an EMG and NCV (nuclear venogram) to
plaintiff's right cervical and upper extremities that came back
negative (Tr. 465-67). Dr. Egea opined that plaintiff might have
a cervical/shoulder pain syndrome on the right side (Tr. 466). He
recommended that she take non-steroidal medication and
analgesics, and had no other suggestions (Tr. 466).

On June 20, 2002, Medical Imaging, Inc., reported that
plaintiff's MRI on her cervical spine (neck) came back normal
(Tr. 435; 481; 787).

On July 3, 2002, Dr. Egea saw plaintiff and indicated that
her MRI showed mild tendinosis of the right supraspinatus tendon
with a small amount of fluid, and opined that he believed she did
have inflammation in this tendon (Tr. 471).  The doctor
prescribed Prednisone[22] and asked plaintiff to return after the
treatment was completed.

---

[20]Lasegue's sign is a medical sign involving a straight leg
raise (SLR).

[21]Patrick's sign is a test for people who have low back pain
for sacroiliitis. It involves the external rotation of the leg at
the hip joint.

[22]Prednisone is a synthetic corticosteroid drug that affects
the immune system.

21

On July 24, 2002, Dr. Egea wrote to Dr. Aspinwall and stated that plaintiff showed no major changes with Prednisone and recommended that she receive local cortizone injections in the right supraspinatus tendon (Tr. 472).

On September 20, 2002, plaintiff was seen at Swope Parkway Northland Clinic for a follow-up on her right arm (Tr. 1090). The physician found right epicondylitis and a positive Tinel's sign in the right elbow.

On September 30, 2002, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall (Tr. 170). Plaintiff showed pain to the right lateral epicondyle and right shoulder, and positive Tinel's sign over right medial elbow.

On October 1, 2002, plaintiff had therapy at Liberty Hospital to address her rotator cuff problems (Tr. 264).

On October 14, 2002, plaintiff went to Swope Parkway Northland Clinic, was seen by Dr. Aspinwall, and reported improvement and decreased pain (Tr. 168). Plaintiff had a positive Tinel's sign at the right elbow, tenderness over the right trapezius, and pain in her shoulder even to light palpation.

On November 1, 2002, plaintiff had therapy at Liberty Hospital to deal with her rotator cuff problems (Tr. 259).

On November 4, 2002, plaintiff went to Swope Parkway Northland Clinic, was seen by Dr. Aspinwall for a follow-up visit

on her physical therapy, and was showing improvement (Tr. 164).

On December 1, 2002, plaintiff had therapy at Liberty Hospital to deal with her rotator cuff problems (Tr. 227).

On December 20, 2002, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall (Tr. 163; 755; 1082). Plaintiff stated that her right shoulder and right arm had improved in terms of pain since she started physical therapy twice a week. She reported no problems with her medication. On examination, plaintiff had mild tenderness to palpation of her right anterior shoulder and extensor aspect of her right forearm. She had a negative Tinel's sign at her elbow. Plaintiff was instructed to continue her medications (i.e., Neurontin,[23] Zanaflex,[24] and Mobic[25]) but only take Mobic as needed. On the issue of fatigue, secondary to pain, plaintiff was instructed to get blood work, get adequate rest, and drink adequate water to prevent dehydration.

On January 1, 2003, plaintiff had therapy at Liberty Hospital to deal with her rotator cuff problems (Tr. 227).

On February 1, 2003, plaintiff had therapy at Liberty Hospital to deal with her rotator cuff problems (Tr. 227).

---

[23]Anti-epileptic medicine.

[24]Short-acting muscle relaxer.

[25]Non-steroidal anti-inflammatory.

On February 3, 2003, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall (Tr. 162; 754; 1080). Plaintiff was complaining about chronic right shoulder pain and arm pain. Plaintiff reported going to physical therapy one to two times per week and showing slow but steady progress on her right upper extremity. Plaintiff reported that her pain had improved but she was disappointed in her inability to perform many tasks with her upper extremity. Plaintiff reported no significant side effects with her medication, observing that the addition of anti-inflammatory medication had helped. Plaintiff reported no side effects from the Relafin.[26] On examination, plaintiff had mild tenderness to palpation over her right shoulder with pain on abduction of the shoulder at approximately 90 degrees. She showed negative Tinel's sign at her elbow and allodynia (other pain) over her arm and forearm. Plaintiff was continued on her medications (i.e., Neurontin, Zanaflex, and Relafen).

On April 3, 2003, a therapist at Liberty Hospital wrote to Dr. Aspinwall summarizing plaintiff's progress with physical therapy after 19 visits, and requesting additional visits for therapy (Tr. 199; 574). The therapist stated that plaintiff had made excellent progress in two months, that she had increased cervical range of motion, increased right shoulder and arm range

_____

[26]Non-steroidal anti-inflammatory.

24

of motion, and improved activity tolerance with her neck, shoulders, and right arm.

On May 16, 2003, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall (Tr. 155; 735). This was a follow-up visit dealing with plaintiff's right shoulder and neck pain. Plaintiff stated that the physical therapy had improved her pain considerably and the only time she had pain was when she used her right arm. She represented that driving was painful and took several hours to recover from the pain. Dr. Aspinwall noted that plaintiff had discontinued taking all her pain medications except for Zanaflex, which was taken occasionally. Plaintiff was examined and found to have several trigger points over her right trapezius and right thoracic paraspinal muscles, but no tenderness to palpation over her shoulder, elbow, or wrist. Plaintiff was instructed to continue physical therapy, use a heating pad, and perform stretching exercises before she starts any activity.

On June 12, 2003, a therapist at Liberty Hospital wrote to Dr. Aspinwall summarizing plaintiff's progress with physical therapy after 19 visits, and requesting additional visits for intensive and aggressive therapy (Tr. 180; 547). The therapist represented that plaintiff continued to make excellent progress with her neck pain. Plaintiff demonstrated increased cervical range of motion, increased right shoulder and arm range of

motion, and improved activity tolerance with her neck, shoulders, and right arm. The therapist observed that plaintiff's pain had dramatically decreased, and that she was not taking any pain or anti-inflammatory medications. Finally, the therapist said that plaintiff had started to perform household chores without any major irritation.

On June 18, 2003, plaintiff had therapy at Liberty Hospital for right arm and neck pain (Tr. 179).

On July 25, 2003, Janice Hendler, M.D., completed a Physical Residual Functional Capacity Assessment on plaintiff - projected to May 2004 (Tr. 284-91). Dr. Hendler opined that plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand for six hours; sit for six hours; push and pull with limitations on her right upper extremities; frequently climb, balance, stoop, kneel, crouch; and occasionally crawl. The doctor indicated that plaintiff was limited in handling - explaining that with continued physical therapy one should expect a reduction in manipulation limitations. The doctor explained her findings as follows:

> [Claimant] alleges disability due to shoulder problem.
> [Treating physician] indicates pain in elbow, arm, shoulder
> and neck that is chronic in nature. [Claimant] began
> physical therapy in 10/02 and continues to go. PT
> evaluation in 6/03 indicates full [range of motion] in
> [right upper extremity] including wrist, elbow, shoulder and
> neck. However, strength is still decreased. [Activities of
> daily life] indicate inability to lift with [right upper
> extremity] and use of right hand. [Claimant] indicates
> difficulty writing, driving and dishes. [Claimant] is able

26

to shop, prepare small meals, and complete self care.
[Claimant] does not allege difficulty using eating utensils,
but did receive help to fill out forms. [Activities of daily
life] also indicate trouble with stand/walk greater than 30
minutes, however there is no medical evidence of a problem
that would limit this, nor does [claimant] discuss this
issue with [treating physician], therefore there is no MDI
[medically-determined impairment] that would limit
stand/walk ability. [Claimant's] allegations are partially
credible.

(Tr. 289.)

On August 14, 2003, a therapist with Liberty Hospital wrote
that plaintiff demonstrated full extremity and spinal range of
motion without pain, she had continued increasing her activity
levels with all daily activities, but had not been able to
tolerate resistive activities without discomfort (Tr. 524). The
therapist said that plaintiff was then ready to begin a work
hardening/work conditioning program.

On September 11, 2003, plaintiff went to Swope Parkway
Northland Clinic and was seen by Dr. Aspinwall (Tr. 811; 1063).
Plaintiff reported that the physical therapy had improved her
pain level and that she only had pain when she did certain
movements with her shoulder. Plaintiff said that she was only
taking Zanaflex for pain and usually only after physical therapy.
The doctor instructed plaintiff to continue with physical
therapy.

On October 8, 2003, plaintiff went to Swope Parkway
Northland Clinic and was seen by Dr. Aspinwall (Tr. 806; 1058).
Plaintiff complained that physical therapy was no longer

27

improving her condition. She stated that one particular physical therapist was helping her but that there were no other therapists using the same technique. Plaintiff said that she did not want to return to the use of medication for pain relief. The plan included referring plaintiff to a physiatrist for further evaluation and management of her pain.

On October 20, 2003, a therapist from Liberty Hospital wrote that plaintiff said she was without pain until she had to sign her name on some papers when she came in for treatment (Tr. 497). The therapist commented that plaintiff was frustrated with the change in her therapist and was resistant to increasing use of the right upper extremity. Plaintiff represented that she could wash her hair without difficulty but was unable to perform active-assisted range of motion using pulleys because of pain, which the therapist wrote was "very perplexing." Plaintiff was instructed in some gentle exercises on September 26, 2003, but never returned for treatment. The therapist discontinued treatment at that time.

On November 12, 2003, plaintiff went to St. Luke's Northland was seen by John R. Tait, M.D. (Tr. 827-28). Plaintiff represented that she did not use any adaptive equipment, was independent with all of her advanced and basic activities of daily living, smoked a half a pack of cigarettes a day, and did not use alcohol (Tr. 827). Plaintiff denied any psychiatric

28

issues (Tr. 827). On examination, Dr. Tait observed in part:

> [Plaintiff] gives somewhat of a difficult history to
> extract, is somewhat vague with the specifics of her
> condition, and I am not exactly certain what led her to this
> visit. . . . The right arm she reacts in an exaggerated
> fashion when palpating over the posterior aspect of the
> glenonumeral joint. Passive range of motion is very guarded
> and protected. The hand and elbow have functional ranges of
> motion. Sensation appears to be grossly intact to light-
> touch and pinprick. Motor tone and muscle stretch reflexes
> all appear to be intact. She withdraws at any attempt to try
> to mobilize and move the arm, recoils in pain and says that
> the arm is going to hurt significantly after she gets home.

(Tr. 827-28.)

Dr. Tait's impression listed (1) very confusing pain syndrome of the right shoulder, (2) exaggerated response to pain, and (3) multiple work-ups in the past without success.

On January 14, 2004, plaintiff went to St. Luke's Northland and was seen by Dr. Tait (Tr. 829-30). Dr. Tait found on examination:

> [Plaintiff] is moving in and out of the treatment room
> extremely well.  Again, she has some guarding and limited
> movements, although with some distraction appears to have
> some ability to move the right arm without difficulty.
> Capacity of range of motions are unremarkable of the right
> when moving the arm. No crepitation is felt. She does have
> an exaggerated breathing when moving the arm. Strength
> testing of the right grip in multiple positions shows it to
> vary from 2 pounds and almost no effort to 10 pounds with
> varying positions to 6 pounds with a very exaggerated pain
> movement. In fact, in one of the side-lying positions she
> winced and was very hypersensitive and could not function. .
> . . She claims some allodynic-type pain with light touch.
> Muscle stretch reflexes appear to be symmetrical. Otherwise
> she is gaiting extremely well. Respirations are unlabored
> and she does not appear to have any limits in function other
> than the focal pain of the right side.

(Tr. 830.)

Dr. Tait explained to plaintiff that her reactions to the exam, movement, and touch were out of proportion to any physical finding, and he started her on Celebrex[27] after acknowledging plaintiff's poor tolerance of physical therapy (Tr. 831).

On February 25, 2004, plaintiff went to St. Luke's Northland and was seen by Dr. Tait (Tr. 1230). Dr. Tait recounted that he had ordered physical therapy but that plaintiff did not tolerate it very well. Dr. Tate had requested prior medical records which were not forthcoming. Dr. Tait said that plaintiff was somewhat vague about the specifics of her past medical history. Dr. Tait recorded that plaintiff said she was doing better with Celebrex and that her shoulder pain and symptoms had improved. During this visit, Dr. Tait observed:

> [Plaintiff] appears well dressed and appointed, ambulating in and out and showing no obvious physical measurable deficits. No atrophies of the arm. No paralysis, but a limited voluntary movement at the shoulder joint. With some distraction, she was able to flex the shoulder a full 180 degrees. She never abducts much past 90. When asking her to go through some [unintelligible] ranges of motion of the shoulder, she does a lot of pursed-lip breathing as if she is having a baby, then she states that the arm is going to hurt quite a bit after having had to move the arm. We reviewed again at length the intolerance to therapy, no bracing and no significant response to any medications. At this point, the goal for her is to try to recover some function over a slower period of time and avoid therapy and other things that may aggravate her condition.

(Tr. 1230.)

---

[27]Non-steroidal anti-inflammatory.

Dr. Tait discharged plaintiff with an unresolved myofascial pain syndrome[28] of the right arm with limited shoulder range of motion (Tr. 1230).

On April 12, 2004, Fernando M. Egea, M.D., reported to plaintiff's counsel on his examination of plaintiff (Tr. 1014). Dr. Egea stated that he saw plaintiff initially after her injury and that her complaints were primarily to her left arm and hand radiating to the left elbow and shoulder (Tr. 1014-18). The doctor noted plaintiff's development of pain in her right elbow, shoulder, and forearm with numbness and tingling due to overuse (Tr. 1014-18). Dr. Egea found on examination plaintiff's shoulders were painful on palpation of the right rotator cuff area, distal portion of supraspinatus muscles and on palpation of the left same muscle (Tr. 1014-18). The doctor noted a limited range of motion on the right and left side. Finally, Dr. Egea found within a reasonable degree of medical certainty that plaintiff suffered from chronic rotator cuff tendinosis of the right and left shoulders, worse in the right (Tr. 1017-18). Dr. Egea recommended continuing medical treatment and opined that plaintiff may need cortisone blocks in the shoulders to alleviate the inflamation and pain (Tr. 1017). Dr. Egea gave plaintiff a partial disability rating for her injuries: 30 percent to the

_____

[28]Myofascial pain syndrome is a term used to describe on of the conditions characterized by chronic, sever pain.  It is associated with "trigger points."

31

right upper extremity at the 232 weeks level and 15 percent to the left upper extremity at the 232 weeks level (Tr. 1018).

On August 30, 2004, plaintiff went to Swope Parkway Northland Clinic and was seen by Dr. Aspinwall (Tr. 1270-71). Plaintiff complained that her right arm pain had not improved and she was unable to lift any weight. The doctor observed that the MRI of her neck was normal, her EMG (electromyograph) right upper extremity was normal, and MRI right shoulder showed mild supraspinatus tendonosis. The doctor noted, "We spent 20 minutes discussing the research indicating the need for weight lifting to provide fiberblasts lines of stress to lay down collagen fiber. Patient seem[ed] poorly motivated to try PT [physical therapy] again." The doctor referred plaintiff for pain management, ordered physical therapy involving weight lifting, and prescribed Ranitidine.[29]

On September 15, 2004, plaintiff was seen at the Headache and Pain Center and received a cervical epidural for her pain (Tr. 907-09). Plaintiff had current prescriptions for Neurotin and Zanaflex (Tr. 907). On examination, plaintiff's hand digits were normal; her cervical, thoracic, and lumbar spine joints were normal; her pelvis was normal; her right triceps were weak; her upper extremity joints, bones, and muscles were normal; her right lower extremity joints, bones, and muscles were normal; and her

_____

[29]Reduces stomach acid.

32

left lower extremity joints, bones, and muscles were normal (Tr. 909). Plaintiff showed no evidence of psychiatric issues (Tr. 909). Plaintiff was assessed as having neuralgia,[30] neuritis,[31] and radiculitis,[32] and was to undergo additional work-up (Tr. 909).

On September 17, 2004, plaintiff underwent an MRI of her cervical spine at the Headache and Pain Center, which was unremarkable (Tr. 935).

On September 22, 2004, plaintiff was seen at the Headache and Pain Center (Tr. 911-12). Plaintiff's doctor requested an orthopedic physician consult on plaintiff's left arm pain.

On September 27, 2004, Robert A. Worsing, Jr., M.D., reported on his orthopedic consultation (Tr. 931-33). Dr. Worsing's impression was "[Right] shoulder and arm pain without obvious etiology and with strong suspicion of a heavy nonorganic component. Will get plain films of shoulder and elbow and shoulder MRI to evaluation. Anticipate minimal if any findings" (Tr. 933).

On September 27, 2004, plaintiff was seen at the Headache and Pain Center (Tr. 913-15). On psychiatric condition, plaintiff's physician recorded, "The judgment and insight of the

---

[30]Pain that follows the path of a nerve.

[31]General inflammation of the peripheral nervous system.

[32]Radicular pain.

33

patient is impaired. Insight seems somewhat lacking." (Tr. 914).
The doctor's impression was recorded as "[Right] shoulder and arm
pain without obvious etiology and with strong suspicion of a
heavy nonorganic component. Will get plain films of shoulder and
elbow and shoulder MRI to evaluate. Anticipate minimal if any
findings." (Tr. 915).

On September 30, 2004, plaintiff underwent an MRI of her
right shoulder at the Headache and Pain Center, which was
unremarkable (Tr. 934).

On October 5, 2004, plaintiff was seen at the Headache and
Pain Center (Tr. 916-18). The doctor advised plaintiff to
continue physical therapy and quit smoking (Tr. 918). Plaintiff
was given an injection of Marcaine and DepoMedrol (Tr. 918).

On October 22, 2004, plaintiff went to Swope Parkway
Northland Clinic and was seen by Dr. Aspinwall (Tr. 1268-69).
Plaintiff complained about severe right shoulder pain and neck
pain. The doctor reviewed a letter from physical therapy stating
that plaintiff was having moderate improvement.

On November 1, 2004, plaintiff was seen at the Headache and
Pain Center (Tr. 919-21). On inspection of plaintiff's
musculoskeletal system, the doctor noted that she had a normal
gait, normal station, and her digits were normal on inspection
and palpation (Tr. 920). There was moderated tenderness of her
right spine, pain at the medial scapula on the right, and her

34

clavicle, ribs and sternum were normal (Tr. 920). The doctor noted that plaintiff wished to proceed with right shoulder arthroscopic and labral treatment as needed (Tr. 921).

On November 8, 2004, Dr. Rattay at Doctors Specialty Hospital performed a right shoulder arthroscopic subacromial decompression, distal clavicle excision, and labral tear debridement and repair followed by partial rotator cuff tear repair. His postoperative diagnosis indicated that plaintiff suffered from right shoulder subacromial impingement syndrome, acromioclavicular joint degenerative joint disease, labral wear and tear and partial rotator cuff tear (Tr. 938-39; 1160-61).

On November 18, 2004, plaintiff was seen at the Headache and Pain Center (Tr. 922-23; 1183-84). Plaintiff was directed to begin physical therapy as tolerated after her surgery (Tr. 923).

On December 13, 2004, plaintiff was seen at the Headache and Pain Center (Tr. 924-25; 1181-82). Plaintiff's doctor commented:

> Doing well. She has only had 2 weeks of therapy. She is 5 weeks from surgery. Her current ROM [range of motion] is fairly typical at this point. She did not go to therapy the past week due to some vague elbow and forearm symptoms on the right. I discussed repeating the cervical and shoulder MRI and the right U.E. [upper extremity] EMG due to these symptoms. She declined and stated the symptoms are identic[al] in severity and nature to those she had pre-op. I stressed the importance of a proper rehab program. Cont. therapy. Last Darvocet[33] script - discussed with her.

(Tr. 925.)

---

[33]Darvocet is a narcotic pain reliever.

On January 13, 2005, plaintiff was seen at the Headache and Pain Center (Tr. 926-27; 1178-80). Plaintiff's doctor commented that plaintiff had limited active and passive motion two months after her right shoulder arthroscopy (Tr. 928). The doctor discussed other options including further imaging and manipulation (Tr. 928). Plaintiff stated that "she feels that she worsened after driving her car backwards up a hill" (Tr. 928).

On February 15, 2005, plaintiff was seen at the Headache and Pain Center (Tr. 929-30). Plaintiff reported pain in the joint shoulder region (Tr. 930; 1176-77).

On February 18, 2005 , plaintiff was seen at the Headache and Pain Center (Tr. 992). An MRI of her right shoulder was essentially unremarkable.

On February 26, 2005, plaintiff was seen at the Headache and Pain Center (Tr. 989-91). On examination, plaintiff's station was normal but she showed tenderness off midline only on the right (Tr. 991). She had decreased range of motion. (Tr. 991). The doctor commented that plaintiff had received some relief with cervical epidural neural block, and proceeded with another since "little else has been efficacious to date." (Tr. 991).

On March 4, 2005, plaintiff was seen at the Headache and Pain Center (Tr. 986-88). Plaintiff reported being in constant pain, and said that her pain was increasing with physical therapy

36

(Tr. 986). On examination, the doctor noted that plaintiff's station was normal, there was decreased tenderness, and increased range of motion (Tr. 987).

On March 11, 2005, plaintiff was seen at the Headache and Pain Center (Tr. 983-85). Plaintiff reported no overall improvement, and the doctor considered a neurology evaluation (Tr. 985).

On March 15, 2005, plaintiff was seen at the Headache and Pain Center (Tr. 980-82). As to plaintiff's musculoskeletal system, the doctor observed:

> Normal gait. Station is normal. Inspection/palpation of digits is normal. Cervical spine: Normal to inspection. Tenderness off midline only on the right diffusely moderate in intensity. Normal range of motion. Neuromuscular exam normal.

(Tr. 981.)

In comments, the physician said:

> She is 4 months post right shoulder arthroscopy. She states that one of her main problems, which she had even before surgery, is pain more medial to the shoulder and she points to the upper and mid-trapezius and posterior neck. She did state that the pain at the shoulder and distral has improved. I discussed that if she is still symptomatic, she may need to see a neurosurgeon. Her shoulder motion today is good and is functional.

(Tr. 982.)

On April 1, 2005, a physical therapist at St. Luke's Northland wrote: "Patient has been seen for 26 visits consisting of therapeutic exercise and ultrasound. Patient has not returned for [physical therapy]. Goals last assessed 2-25-05[.] See

37

progress note dated 3-1-05." (Tr. 1185).

On April 1, 2005 , plaintiff was seen at the Headache and
Pain Center (Tr. 977-79). During this visit, plaintiff
complained that her "[p]ain was referred to the left shoulder"
(Tr. 977). Plaintiff said that her pain interferes with most but
not all of her daily activities (Tr. 977). Plaintiff reported
smoking since 1981 and at the day of the appointment was
consuming an average of 10 cigarettes per day (Tr. 978). In the
psychiatric section, the doctor reported normal mental status,
judgment, and insight (Tr. 978). The plan included test
evaluation and treatment evaluation including an MRI thoracic
spince for further evaluation of the plaintiff's cervicothoracic
and periscapular [right] pain (Tr. 979).

On May 16, 2005, Dr. Fernando Egea examined plaintiff (Tr.
1272-73). The doctor documented that plaintiff's final diagnosis
after shoulder surgery was a right shoulder subacromial
impingement syndrome, achromial clavicular degeneration, labral
wear and tear, and partial rotator cuff tear (Tr. 1272). The
doctor found plaintiff still had pain in her right and left
shoulder (Tr. 1272). The doctor indicated that plaintiff would
need continuing medical treatment and medication to cope with her
chronic pain (Tr. 1272). Dr. Egea restricted plaintiff to no
reaching above her shoulder level, use of her shoulders in
lifting and carrying, and indicated that she would not be able to

38

lift more than ten pounds. The doctor stated his opinion that plaintiff would not be able to perform any manual labor jobs requiring the use of her shoulders, and that she would not be able to perform desk type work if plaintiff was not provided proper training (Tr. 1273).

On August 15, 2005, plaintiff went to Dr. Ronald Zipper for an independent medical examination at the request of the Missouri Family Support Division after applying for medical assistance from the State of Missouri (Tr. 1251-55). Plaintiff rated her pain as 6/10 at worst and 2/10 at best (Tr. 1252). Plaintiff represented that she had not driven a car since 2001[34] as a result of her neck pain (Tr. 1252). Plaintiff represented that she sustained a worker's compensation injury on February 28, 2001, and that although no time was lost from work, plaintiff said she stopped work because of increasing pain and loss of grip strength (Tr. 1252). Dr. Zipper's examination found paravertebral muscular spasm over the upper back along with limitations on range of motion. Plaintiff's shoulder exam revealed a trigger point over the right medial scapular (Tr. 1254). Dr. Zipper noted that his findings were based on subjective complaints as well as the objective medical evidence. The doctor found plaintiff suffered from chronic pain syndrome (Tr. 1255). The doctor noted

---

[34]This contradicts the medical reports wherein plaintiff reported having driven her car up a hill backwards on January 13, 2005.

plaintiff's complaints of right shoulder pain and subjective neck pain (Tr. 1255). The doctor found plaintiff had a loss of motion of the shoulder and 20% weakness of right biceps (Tr. 1255). Dr. Zipper stated that there was no symptom magnification when he performed a symptom distraction test (Tr. 1255). The doctor observed that plaintiff had subjective neck pain, without objective findings to support an ongoing radiculopathy to the right upper extremity (Tr. 1255). The doctor opined that he could not rule out an injury to the right thoracic nerve (Tr. 1255).

## C.    *SUMMARY OF TESTIMONY*

On March 26, 2006, an administrative hearing was held before ALJ James S. Stubbs. A second hearing was held on June 5, 2006, before ALJ George Bock.

At the second hearing, plaintiff's counsel raised the issue of a somatoform disorder,[35] conceding that no doctor had diagnosed plaintiff as suffering from the condition but arguing that Section 12.07 does require the need for treatment by a psychologist (Tr. 1321).

## 1.    **Testimony of plaintiff Tracy Wilburn**

Plaintiff was 40 years of age at the time of the hearing (Tr. 1279). At the time of the hearing she lived in a house with

---

[35]Somatoform disorder (or Briquet's syndrome) is a psychological disorder characterized by physical symptoms that mimic a disease or injury for which there is no identifiable physical cause. It is not the result of conscious malingering or factitious disorders.

Case 4:08-cv-00430-REL   Document 22   Filed 09/03/09   Page 40 of 77

two of her three children, ages 19 and 17 (Tr. 1279). Plaintiff's highest level of education was eleventh grade (Tr. 1281). Plaintiff had since made two unsuccessful attempts to obtain a GED (Tr. 1281).

Plaintiff last worked for Ford Motor Company as a cashier in the cafeteria at the Claycomo, Missouri plant (Tr. 1282). Plaintiff quit her job as cashier due to the pain in her left wrist, right arm, and shoulder (Tr. 1283). While working for Ford Motor Company, plaintiff originally injured her left wrist in March of 2001 when she dropped some food trays while clearing a table (Tr. 1283). Plaintiff subsequently injured her right arm and shoulder while on light duty for the original injury to her left wrist (Tr. 1283-84; 1333; 1337). Plaintiff commenced her employment at Ford Motor Company in September of 2000 (Tr. 136).

Plaintiff previously worked as a receptionist for a chiropractor in 1988 (Tr. 188; 1284). Plaintiff left the chiropractor's employment because she was pregnant with her second child. Plaintiff did not work from 1988 to 2000 because she wanted to be a full-time homemaker and raise her family (Tr. 136; 1285; 1334).

Plaintiff currently has left wrist pain, neck pain, right elbow pain, right shoulder pain, right hand and wrist pain, numbness in her fingers, pain around cervical spine, pinching and swelling around her spine, and right upper extremity pain (Tr.

Case 4:08-cv-00430-REL   Document 22   Filed 09/03/09   Page 41 of 77

1285-86; 1291). Plaintiff's pain is exacerbated during rainy and cold weather (Tr. 1290).

Plaintiff has trouble grasping items with her right hand, has cramping in her two smallest fingers and is only able to pick up about five pounds with her left hand (Tr. 1293; 1336). She can only sometimes pick up a glass that is full with her right hand or a small pitcher with her left hand (Tr. 1336).

Plaintiff had right shoulder surgery in November 2004 to repair a tear in her rotator cuff (Tr. 1293). While the shoulder surgery did help to alleviate some pain, there are days when the pain is severe and her pain worsens (Tr. 1293; 1337). Once or twice a week the pain is so severe that plaintiff is unable to do anything other than just lie around and watch television (Tr. 1294).

Plaintiff has been prescribed pain medications (i.e., Zanaflex, Vicodin, Neurontin) but discontinued taking these medications because of their side effects (Tr. 1295).

Plaintiff's daily activities on a good day consist of some laundry, washing a few dishes, and light cooking (Tr. 1296). Plaintiff testified that she needs help with these tasks (Tr. 1296-97). Plaintiff needs help carrying the laundry baskets, and she cannot hang up the clothes (Tr. 1296). Plaintiff is unable to cook a single meal at one time without having to sit down (Tr. 1297). Plaintiff cannot complete simple tasks such as washing the

42

dishes without having to stop to sit or lie down because of the pain the chore causes her (Tr. 1297). Plaintiff stated she is only able to stand to wash dishes for ten minutes at the most (Tr. 1297). Plaintiff mostly spends the day sitting or lying on the couch (Tr. 1298).

Plaintiff is unable to sleep through the night because of her pain (Tr. 1298).

Plaintiff is able to shop for groceries but only with the help of her son or daughter to lift the groceries (Tr. 1298). Plaintiff also requires assistance carrying the groceries into the house (Tr. 1298).

Plaintiff is able to sit for ten minutes comfortably (Tr. 1298). Plaintiff is able to sit for 30 minutes to an hour if she can shift continuously in her chair (Tr. 1299). The longest plaintiff can stand is ten minutes (Tr. 1299). Plaintiff is able to walk a mile, but at a slow pace (Tr. 1299). Plaintiff is unable to bend over (Tr. 1299). Plaintiff can stoop but has trouble getting back up (Tr. 1299). Plaintiff has the ability to reach out in front of her, but she is unable to push objects (Tr. 1299). Plaintiff is unable to do any reaching upwards (Tr. 1299).

Plaintiff attends church once or twice a month whereas she used to go to church three times a week (Tr. 1300). Other than church, plaintiff is unable to go out and socialize due to pain (Tr. 1300).

Plaintiff has difficulty taking care of her personal needs (e.g., shaving her legs) (Tr. 1304). There are certain days when she is unable to maintain her personal needs at all (Tr. 1305)

Plaintiff currently receives support from TANIF (child support) and Medicaid (Tr. 1300). Plaintiff has discontinued physical therapy on the recommendation of Dr. Rattay (Tr. 1303). The physical therapy was causing plaintiff too many nerve problems in addition to making her neck swell (Tr. 1303). Plaintiff currently takes Singulair to help control her asthma (Tr. 1304). Plaintiff testified that she has had little success with physical therapy (Tr. 1306). Plaintiff attended over 100 sessions of physical therapy for her injuries (Tr. 1307). Plaintiff maintains a driver's license, but is unable to drive due to pain in her elbow and spine (Tr. 1279, 1334-1335).

**2.    Testimony of plaintiff's son, Christopher Wilburn**

Christopher Wilburn is plaintiff's nineteen-year-old son (Tr. 1307). Mr. Wilburn currently lives with plaintiff and his sister (Tr. 1307). Mr. Wilburn testified that plaintiff's daily activities consist of lying around and watching television (Tr. 1308). Plaintiff might do some dishes or a little laundry (Tr. 1308). Mr. Wilburn testified that he has to help plaintiff put away dishes and laundry (Tr. 1308). He represented that plaintiff is unable to vacuum or clean the house (Tr. 1308). Mr. Wilburn and his sister are responsible for cleaning the house, doing the

44

yard work, and helping with the shopping (Tr. 1308). He observed

that plaintiff's pain worsens when it is cold or rainy outside

(Tr. 1308-09). Mr. Wilburn expressed concerns over plaintiff's

ability to attend doctor visits and satisfy her daily needs

should he leave the home (Tr. 1309).

**4.   Testimony of medical expert Daniel Girazadas**

Dr. Daniel Girazadas testified at the supplemental hearing

as the medical expert via telephone (Tr. 1322). Dr. Girazadas

reviewed plaintiff's medical records (Tr. 1323).  The doctor

acknowledged that he is familiar with the Social Security

listings of impairments (Tr. 1323).  Dr. Girazadas testified that

plaintiff does not meet any of the listings (Tr. 1323-24).

Dr. Girazadas believed that plaintiff could lift 20 pounds

occasionally and ten pounds frequently; occasionally reach over

shoulder height; frequently work from floor to shoulder height,

handle, and finger; and she had unlimited sensation with right

upper extremity (Tr. 1324).

As to the bases for his conclusions, Dr. Girazadas testified

as follows:

> Q.   Doctor, with regards to those limitations you testified
>      to on her right upper extremity.  How did you arrive at
>      those particular weights that you did?
>
> A.   Well, I arrived at them because of the findings in the
>      surgical report, which is reported on numerous places
>      in the record, at 25F1.  It shows you what she had on
>      November 8th, 2004.  The findings on 26F14, and the
>      findings on 26F15, which are the post-operative reports
>      from the treating source, and the MRI of the right

45

shoulder, which was done after surgery, and let me see
where I can find that.  I have it flipped here some
place.  And the findings of the IME, which is on 28F,
and the findings of a normal EMG and normal oh, here it
is.  On 21F, page 7, which is February 18, 2005, which
is a post-operative upper right to the right shoulder
in which the diagnosis, or the reason for the MRI was
frozen shoulder with decreased range of motion, and the
MRI report was unremarkable except for mild
acromioclavicular arthrosis which they noted on the
examination there was no evidence of fibrosis, or
retraction of the rotator cuff.  That is the reason for
my making her for the limitations to the right upper
extremity.

Q.   Now with regards and you referred to the surgical
report as being one of the components of that opinion.
Now there wasn't anything in that surgical report that
set forth any weight restrictions by any of the
treating doctors, is that correct?

A.   Well, the only limitation that was noted was on 30F,
which is on May 16th, 2005, by Hernando Egea.  I don't
know if I pronounced it properly, Dr. Egea, which
states that he estimates that she will not be able to
carry over 10 pounds.  Now here is a note, and whether
or not that is frequent or occasional, and it is just a
generalized statement, and that is pretty much the
extent of the, and let me look at 28F and see if they
mention any weight restriction.

Q.   And that is the IME [independent medical examiner]
report?

A.   Yes.  It is the IME report.  He notes that the only
thing that she has is 20 percent weakness of the right
bicep, and a 20 percent weakness of the right bicep is
not something which would limit her to less than 20
pounds occasional.

(Tr. 1324-26.)

Dr. Girazadas did not examine or talk with plaintiff (Tr.

1327; 1330). Dr. Girazadas acknowledged that obtaining the

46

history and physical from her would be the hallmark of diagnostic interpretation (Tr. 1330-1331).

Concerning plaintiff's recent complaints, Dr. Girazadas testified as follows:

> Q.   And now with the materials that you were given anything
>      that showed what kind of complaints that she is
>      currently having with both her right and left upper
>      extremities?
>
> A.   Well, as it is noted in her record, the last record I
>      have is 30F, and that is from May 15, 2005, and in that
>      record it notes that she has had complaints of pain in
>      her left shoulder which are to a lesser degree than her
>      right. But as I stated, there are no objective findings
>      in the record, namely any testing, or examinations
>      other that the IME which I have alluded to, which
>      referred to her left shoulder.
>
> Q.   And now have you seen anything regarding any statements
>      or testimony that she has given with regards to her
>      right upper extremity with her basic inability to use
>      that right upper extremity because of pain complaints?
>
> A.   Well, her complaints are related to pain in her right
>      upper extremity, and that is throughout the record.
>
> Q.   All right. But have you heard to what extent the pain
>      limits her ability to use her right upper extremity?
>
> ALJ: Mr. Whipple -
>
> ME:  Well, there is a report by Dr. Egea on June 17th 2002,
>      which is 23F, page 8, which notes the normal
>      neurological examination, and the normal EMG to both
>      upper extremities.  And on 23F, pages 1 through 5,
>      which is April 12th 2004, he notes that she has pain in
>      her right upper extremity to 7/10, and her left upper
>      extremity to 3/10 in which he makes a diagnosis of
>      chronic rotator cuff tendonosis, the right worse than
>      the left.  And that is just basically the only real
>      document noting of the possibility of the amount of
>      pain that she is having in her shoulders.

Case 4:08-cv-00430-REL   Document 22   Filed 09/03/09   Page 47 of 77

Q.   Do you think those pain complaints as you saw there are supported by the objective medical evidence?

A.   Well, there are other reports in the record which do not value the pain that the patient is having, or the claimant is having, as much as Dr. Egea.  And, for example, there is a report in the physical therapy notes from April 3rd, 2003, on 15F, page 81, which notes that the claimant is able to do all of the things she hadn't been able to do for the last year. She has a full range of motion in her right arm and her neck. Another report done by a physical therapist on June 12th, 2003, on 16F, page 54, which notes that she has a range of motion of her right upper extremity and her neck without any pain and she is doing very well. There is a note by Dr. Tate on 18F, page 3, which is November 12th, 2003, which notes that she is having an exaggerated pain response, and the report from the IME notes that she has gotten basically almost a full range of motion.  No impingement and no preface. So I have to value these reports as I would the reports of Dr. Egea who is one of the treating sources, and I have to qualify his reports but those others. So, you know, I am sort of left with the fact that she has some pain but I don't know exactly how much.

(Tr. 1328-30.)

Dr. Girazadas' sole focus in his medical practice is orthopedic surgery (Tr. 1327). His regular practice does not consist of pain management or pain rehabilitation, he is not Board certified in that area and did not practice in any regard as a pain management specialist (Tr. 1327).

**6.   Testimony of vocational expert Barbara Myers**

Barbara Myers, a vocational expert, testified at the supplemental hearing (Tr. 1338). Ms. Myers described plaintiff's past relevant work as a cashier, light and unskilled (Tr. 1339).

48

The Administrative Law Judge's first hypothetical involved an individual who could lift and carry, push and pull ten pounds occasionally and nominal weights frequently, could stand and walk a total of six hours a day, could sit six hours a day, had no manipulative limitations, and limited push/pull with the right arm to nominal weights, no overhead work, no reaching above the shoulder with the right arm, no crawling, climbing of ladders, ropes, or scaffolds, and no exposure to concentrated airborne irritants (Tr. 1340). In response to this, Ms. Myers indicated plaintiff could not perform her past work as cashier (Tr. 1340). Ms. Myers did indicate there would be sedentary work available such as order clerk, interview clerk, receptionist, and inspector (Tr. 1340-41).

Plaintiff's attorney modified the hypothetical presented to Ms. Myers to include complaints that plaintiff testified to but were not included in the ALJ's hypothetical. These additional complaints included significant pain complaints in her right arm, shoulder, neck, and upper back. As a result of those complaints, plaintiff would have to lie down at least once or twice during the day to relieve pain (Tr. 1342). In response to this, Ms. Myers indicated there would be no jobs plaintiff could perform (Tr. 1342). Plaintiff's counsel then further modified the hypothetical to lifting ten pounds occasionally, nominal weight frequently, sitting for 20 to 30 minutes at a time, standing ten

49

to 30 minutes at a time, no bending, limited walking, unable to
drive a vehicle, and two to three breaks outside of normal work
breaks (Tr. 1343). Ms. Myers was again unable to provide any jobs
for plaintiff with these restrictions (Tr. 1343). Ms. Myers also
stated that there are no jobs available for an employee who would
have to lie down during the day (Tr. 1344). In addition, Ms.
Myers testified that if an employee has to miss work at least
once a week due to pain complaints there would be no jobs that
employee could perform (Tr. 1344).

## V.    *FINDINGS OF THE ALJ*

ALJ George M. Bock filed an undated decision (Tr. 21-28).
In that decision, the ALJ recounted the medical evidence as
follows:

> The medical evidence reflects that the claimant injured her
> upper extremities in 2001 while at work at Ford Motor
> Company.  The claimant was treated by Fernando Egea, M.D.,
> for chronic rotator cuff tendinosis in both shoulders, worse
> on the right.  An EMG/NCV of the right upper extremity and
> MRI of the cervical spine were normal in June 2002.  At the
> time an MRI of the right shoulder showed mild tendinosis of
> the supraspinatus muscles. (Exhibit 23F) She participated in
> pain management for her right shoulder, but had progressive
> problems with the right shoulder. Progress notes from Swope
> Health indicate no complaints of left shoulder pain.
> (Exhibit 24F) The claimant had arthroscopic surgery to her
> right shoulder in November 2004 and was diagnosed with right
> shoulder subachromial impingement syndrome, achromio-
> clavicular degeneration, labral wear and tear and partial
> rotator cuff tear. (Exhibits 20F and 25F) The claimant
> participated in therapeutic exercise and ultrasound after
> her surgery until March 2005. (Exhibits 20F and 27F) Dr.
> Egea opined in a letter dated May 16, 2005, that the
> claimant is limited in reaching above shoulder level and
> carrying over 10 pounds, but she should be able to [do] desk
> type work. (Exhibit 30F) In August 2005, an independent

medical examiner indicated that the claimant had some loss of motion of the right shoulder and 20 percent weakness of the right biceps. (Exhibit 28F)

The medical expert testified that post-operative reports show her sensation has been unlimited with the right upper extremity since her surgery. Also, the medical expert indicated that her most recent MRI of the claimant's right shoulder was unremarkable except for mild tendinosis of the supraspinatus muscles. (Exhibit 21F/7) Further, on June 12, 2003, physical therapy notes show full range of motion of the shoulder. Moreover, Dr. Girzadas indicated that the claimant had exaggerated pain response on November 12, 2003 at Exhibit 18F. The medical expert reported that there are no objective findings in the record regarding the left shoulder. Overall, the medical expert opined that the claimant could lift 20 pounds occasionally and 10 pounds frequently and occasionally reach over her shoulder, but she could frequently do floor to shoulder height work and would be unlimited in handling and fingering. The undersigned finds that this testimony is generally supported by substantial evidence of record and credible.

The undersigned has considered all the opinions of the treating and examining physicians. There is really no treating source statements in the record that would limit claimant, except for Dr. Egea, who indicates sedentary work at Exhibit 30F. The undersigned generally agrees with the sedentary opinion of Dr. Egea, but he appears to overstate the claimant's pain limitations. The claimant's pain did not become severe enough to warrant surgery until November 2004 and progress notes indicate that she initially did well with conservative treatment and physical therapy. Moreover, while the claimant indicated that she continues to have right shoulder pain, she has refused further testing to determine the problem. Further, the record shows that she stopped participating in therapy after March 2005, indicating her symptoms had improved.

The undersigned has considered the findings, opinions, and assessments of [the] non-examining State Agency physician (Exhibit 6F) and has accorded them some weight, because they are consistent with the medical evidence at the time the assessments were made.

(Tr. 23-24.)

51

Specifically on the issue of plaintiff's credibility, the

ALJ wrote:

The claimant alleged that she cannot lift anything with her
right arm. Also, the claimant's attorney argued that she
does not use her right arm and only has some use of her left
arm. However, these allegations are simply not supported by
the medical evidence. As noted above, the claimant did well
with physical therapy and treatment after her injury
initially. The record shows that the claimant had normal
range of motion of the shoulder in 2003. No doctor of record
has opined that the claimant has no use of her right arm. In
fact, her treating physician essentially indicated that she
is only prevented from doing over shoulder height work and
carrying over 10 pounds with her right arm. Moreover, the
record shows very few complaints of left shoulder pain or
problems. Further, the claimant overstated other symptoms
and limitations at the hearing. She testified that her
ability to stand and walk was limited to 30 minutes. The
claimant also complained of hand cramping and tingling.
However, there is absolutely no basis for standing and
walking limitations in the record. Similarly, there has
[been] no medical treatment for her alleged hand cramping
and tingling. The claimant's overstated testimony, coupled
with her exaggerated pain response on November 12, 2003
(Exhibit 18F) lessens the claimant's credibility.

The claimant's credibility is further undermined by her poor
work history. In addition, the claimant's allegations of
pain are not supported by the objective medical record. The
claimant indicated on her Medication list that she is no
longer taking her pain medication, including Zanaflex,
Vicodin and Neurontin. (Exhibit 9E) The claimant testified
that she has bad days where she has to lie down all day. The
claimant reported that she cannot do the dishes, make her
bed, iron, vacuum, sweep, take out the trash, mow the lawn
or garden. (Exhibit 5E) The claimant's son testified that he
does most of these things for her. While the claimant
reported that she could do the laundry and simple cooking,
she needs help carrying objects. (Exhibit 5E) The claimant's
inability to do most household activities is not supported
by the medical record or the opinions of her treating
physician. There is no medical basis in the record for her
need to lie down during the day. This inconsistency
undermines her credibility and suggests that she is more
capable than alleged. Overall, the claimant is physically
limited, but she can still perform some sedentary work.

(Tr. 25.)

The ALJ found that plaintiff has no medically determinable mental impairment because she has had no mental health treatment and there is no diagnosis of somatoform disorder in the record (Tr. 24).

The ALJ found plaintiff had the severe impairments of right shoulder rotator cuff tear, status post arthroscopic shoulder surgery on November 6, 2004, mild residual tendinosis, and mild asthma (Tr. 26-27). The ALJ determined plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in Appendix 1, Subpart P, Regulation No. 4 (Tr. 27).[36] Considering all the evidence, the ALJ found plaintiff had the residual functional capacity (RFC) to perform sedentary work (Tr. 27). After determining that plaintiff could not perform her past relevant work, the ALJ relied on the testimony of a vocational expert to find that a significant number of jobs existed in the national economy that plaintiff could perform (Tr. 27). Therefore, the ALJ found plaintiff was not disabled (Tr. 27).

---

[36]The ALJ's decision inadvertently cited Listing § 12.08, which covers personality disorders. However, the ALJ properly discussed plaintiff's alleged somatoform disorder, not personality disorders (Tr. 24).

53

# VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. <u>Rautio v. Bowen</u>, 862 F.2d 176, 178 (8th Cir. 1988); <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. <u>Gray v. Apfel</u>, 192 F.3d 799, 803 (8th Cir. 1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be

given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

(1)  Plaintiff's allegations of disability were not supported by the objective medical evidence;

(2)  Plaintiff exaggerated her symptoms and limitations;

(3)  Plaintiff's work history showed an unwillingness and lack of motivation to work; and

(4)  Plaintiff's allegations of disabling pain were not supported by evidence of prescriptions for the treatment of pain.

## 1.    PRIOR WORK RECORD

The consistency of a plaintiff's work history is probative of credibility because it is a measure of his or her willingness and motivation to work. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993). A plaintiff's prior work history – characterized by fairly low earnings and significant breaks in employment –

Case 4:08-cv-00430-REL   Document 22   Filed 09/03/09   Page 55 of 77

casts doubt on his or her credibility. <u>Comstock v. Chater</u>, 91 F.3d 1143, 1147 (8th Cir. 1996); <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1996).

Here, plaintiff's work record does not support her credibility.  Over a 21-year period, plaintiff earned about $12,000.00 (Tr. 103-06). She held three full-time jobs over the same period: a cashier for about seven months; a housekeeper for one month; and a receptionist for two months (Tr. 107-11). At her last position as a cashier, plaintiff reported that she quit her job because of increasing pain and loss of grip strength, not because she had lost time on the job (Tr. 1252; 1283).  Plaintiff explained that from 1988 to 2000, she was a homemaker taking care of children; yet, the period just before 1988 reflects the following modest earnings: 1984 (age 18-19) none; 1985 (age 19-20) $891.56; 1986 (age 20-21) $1,158.90; and 1987 (age 21-22) $70.35 (Tr. 103-06).  This factor supports the ALJ's credibility determination.

## 2.  DAILY ACTIVITIES

Plaintiff's claim that she is incapable of doing virtually any daily activities because of her pain is not credible for two reasons. First, there are no such restrictions placed on plaintiff's physical activities in the medical records.

Second, there is at least one significant instance in which the medical record totally contradicts plaintiff's claimed

56

inability to perform daily activities including driving. Plaintiff maintained throughout the administrative process that although she possesses a license to drive, she is incapable of driving because of the pain. Specifically, in a June 24, 2003, questionnaire, plaintiff represented that Dr. Aspinwall advised her against driving because of her condition (Tr. 129); in an August 15, 2005, examination by Dr. Zipper, plaintiff said that she has not driven a car since 2001 because of her neck pain (Tr. 1252); and during the administrative hearing, plaintiff testified that she is unable to drive because of pain in her elbow and spine (Tr. 127; 1334-35). My review of the medical records has failed to reveal any directive by Dr. Aspinwall telling plaintiff to stop driving. Worse, there is an entry in the medical record dated January 15, 2005, from the Headache and Pain Center indicating that plaintiff stated that "she feels that she worsened after driving her car backwards up a hill" (Tr. 928). This material inconsistency casts serious doubt on plaintiff's other representations about her inability to perform daily activities.

This factor supports the ALJ's decision to discredit plaintiff's subjective complaints.

### 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

Plaintiff claims that her pain is unrelenting and so severe that it effectively prevents her from working in any capacity.

The contemporaneous medical records do not have objective medical evidence supporting such allegations of pain, but instead show plaintiff doing several things inconsistent with such representations:

(1)  She voluntarily discontinued taking much of her pain medication (Tr. 155; 180; 806; 811);

(2)  She repeatedly refused to participate in physical therapy despite the recommendations from her doctors (Tr. 384; 497; 916-18; 924-25; 1003-04; 1185; 1270-71); and

(3)  She did not use any adaptive equipment and yet was independent in all of her advanced and basic activities of daily life (Tr. 827).

An ALJ may consider the absence of objective medical evidence when determining a plaintiff's credibility. <u>Forte v. Barnhart</u>, 377 F.3d 892, 895 (8th Cir. 2004) (citing <u>Tennant v. Apfel</u>, 224 F.3d 869, 871 (8th Cir. 2000)).

Additionally, the medical records show plaintiff exaggerated her pain and was somewhat vague about her condition:

(1)  On July 16, 2001, plaintiff's painful reaction to her examination "seem[ed] to be out of proportion to her complaints" (Tr. 375-76);

(2)  On August 20, 2001, plaintiff's doctor wrote, "She is a very difficult person to examine, has litigation issues, and keeps referring to 'overuse' syndrome which she incurred at work. Nevertheless, I am obligated to investigate this" (Tr. 342);

(3)  On October 20, 2003, a therapist wrote that although plaintiff said she could wash her hair without difficulty, she maintained that she was unable to perform active-assisted range of motion using pulleys because of the pain, which the therapist wrote was "very perplexing" (Tr. 497);

58

(4) On November 12, 2003, plaintiff's doctor wrote that
plaintiff was being somewhat vague about the specifics
of her condition and on examination exaggerated her
response to pain (Tr. 827-28);

(5) On January 14, 2004, plaintiff's doctor wrote that
plaintiff was "moving in and out of the treatment room
extremely well. Again, she has some guarding and
limited movements, although with some distraction
appears to have some ability to move the right arm
without difficulty. . . . She does have an exaggerated
breathing when moving the arm. Strength testing of the
right grip in multiple positions shows it to vary . . .
with a very exaggerated pain movement". Thereafter the
doctor explained to plaintiff that her reactions were
out of proportion to any physical finding (Tr. 830);

(6) On February 25, 2004, plaintiff's doctor observed that
plaintiff was somewhat vague about her medical history
and exaggerated her responses - "pursed-lip breathing
as if she is having a baby" (Tr. 1230);

(7) On December 13, 2004, plaintiff failed to go to therapy
because of "some vague elbow and forearm symptoms on
the right" (Tr. 925);

(8) On March 4, 2005, plaintiff reported that her pain was
constant and increasing with physical therapy, but on
examination the doctor found plaintiff's station was
normal, there was decreased tenderness and increased
range of motion (Tr. 987); and

(9) On August 12, 2005, after having been counseled by
another doctor about exaggerating her pain reaction
during physical examination, a medical examiner saw no
symptom magnification by plaintiff; but he also
observed that plaintiff's neck pain was subjective and
without objective findings to support an ongoing
radiculopathy to the right upper extremity (Tr. 1255).

An ALJ may consider a plaintiff's exaggeration of her

symptoms and may rely on his observations of a plaintiff's

demeanor during a hearing when making credibility determinations.

Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) (citing

59

Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir.1993)); Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997).  As the medical records support a finding that plaintiff was exaggerating the intensity of her symptoms, this factor supports the ALJ's credibility finding.

**4.    *PRECIPITATING AND AGGRAVATING FACTORS***

Plaintiff alleges that her pain increases with changes in the weather (i.e., rain and cold). Plaintiff reported such problems in a June 24, 2003, Claimant Questionnaire Supplement (Tr. 124-30) and her son testified to it at the administrative hearing (Tr. 1308-09).  However, the medical records show no entries corroborating this complaint.

The medical records do show plaintiff complaining that physical therapy had made her pain worse and essentially ignoring her physician's recommendations to continue to participate in therapy (Tr. 384; 497; 916-18; 924-25; 1003-04; 1185; 1270-71). Contrary to these allegations of worsening pain with treatment, the medical records actually establish that physical therapy improved plaintiff's symptoms (Tr. 155; 162; 163; 164; 199; 574; 735; 754; 755; 811; 1080; 1082; 1063).

This factor supports the ALJ's credibility determination.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

On March 10, 2005, plaintiff represented to the agency that she was taking the following medications for pain: Zanaflex (with

60

side effect of slow reaction) and Vicodin (with side effect of waking up) (Tr. 133). A year later, plaintiff claimed at the March 21, 2006, administrative hearing that she had been prescribed pain medications but stopped taking them because of their side effects (Tr. 1295). My review of the medical records has failed to uncover any such side effects being contemporaneously reported by plaintiff to her treating physicians. Indeed, the medical records show the opposite to be true:

(1) On December 20, 2002, plaintiff reported no problems with her medications (Tr. 163);

(2) On February 3, 2003, plaintiff reported no significant side effects with her medication, observing that the addition of anti-inflammatory medication had helped and that there were no side effects with Relafin (Tr. 162);

(3) On May 16, 2003, plaintiff reported discontinuing all her pain medications except for Zanaflex, which was taken occasionally, but she said nothing of side effects (Tr. 155);

(4) On June 12, 2003, plaintiff reported discontinuing any pain or anti-inflammatory medications but said nothing about side effects (Tr. 180);

(5) On September 11, 2003, plaintiff said she was only taking Zanaflex for pain, usually only after physical therapy, but she made no mention of side effects (Tr. 811); and

(6) On October 8, 2003, plaintiff said that she did not want to return to using medication for pain relief but she said nothing of side effects (Tr. 806).

In judging credibility, an ALJ may take into account the fact that a plaintiff is not taking prescription medicine to

treat complaints of pain. <u>Davis v. Apfel</u>, 239 F.3d 962, 966-67 (8th Cir. 2001) (citing <u>Shannon v. Chater</u>, 54 F.3d 484, 487 (8th Cir. 1995)). Because the medical records do not support plaintiff's allegations of disabling side effects, and the records establish that plaintiff's pain was not treated with significant pain medication, this factor supports the ALJ's credibility determination.

### 6. *FUNCTIONAL RESTRICTIONS*

Plaintiff claims that her pain prevents her from returning to her past work or doing any other work in the economy.

The medical records reflect very little in terms of functional restrictions. Instead, the records show plaintiff improving with a combination of injections and physical therapy until October 2003, when a particular provider was no longer giving her physical therapy. From that point forward, plaintiff began to avoid therapy - despite the admonitions of her physicians to the contrary - and eventually underwent arthroscopic surgery on her shoulder in November 2004, which similarly failed to provide any relief after plaintiff failed to comply with the doctor's recommendation to undergo physical therapy. Summarizing, the medical records show:

    (1)  On April 3, 2001, plaintiff suffers an injury to her left hand and wrist arising from a fall at work while carrying trays (Tr. 300);

    (2)  On April 25, 2001, plaintiff reports that her left wrist is better but her right wrist is painful and numb

(Tr. 292), and she is returned to regular work (Tr. 302);

(3) on July 16, 2001, plaintiff is injected with Lidocaine and Marcain, which improve her range of motion and relieve her pain (Tr. 375-76);

(4) On June 18, 2001, plaintiff had minor pain in her right elbow, 5/5 strength of her right wrist, and she was released to work with the proviso that she avoid repetitive motions of her upper extremities (Tr. 380-81);

(5) On August 20, 2001, plaintiff repeatedly refers to "overuse" syndrome, which the doctor states, "I am obligated to investigate" (Tr. 342). Plaintiff was never diagnosed with "overuse syndrome";

(6) On September 25, 2001, plaintiff is given an injection of DepoMedrol and Lidocaine and showed increased range of motion (Tr. 408);

(7) On October 5, 2001, examination of plaintiff showed a full range of motion in her shoulder, elbow, and wrist (Tr. 348-49);

(8) On December 3, 2001, plaintiff received a steroid shot in her low back and reported decreased muscle pain, muscle spasm, and overall improvement in her functioning and pain level (Tr. 395);

(9) On December 18, 2001, plaintiff rated her pain as level 1, and stated that her biggest complaint was muscle soreness (Tr. 393);

(10) On April 19, 2002, plaintiff reported pain after cleaning out her refrigerator but said that her condition had been getting better until this incident (Tr. 427);

(11) On May 3, 2002, plaintiff reported that her shoulder was better but she was still having pain in the elbow and hand (Tr. 176);

(12) On June 17, 2002, plaintiff explained to Dr. Fernando Egea that she had overused her right arm as a result of her first injury to her left wrist in 2001, and on examination the doctor found plaintiff's range of

63

motion was good and her muscle bulk and tone were
normal (Tr. 466);

(13) On October 14, 2002, plaintiff reported improvement and
decreased pain (Tr. 168);

(14) On November 4, 2002, plaintiff reported improvement
with physical therapy (Tr. 164);

(15) On December 20, 2003, plaintiff reported improvement
with therapy twice a week (Tr. 163);

(16) On February 3, 2003, plaintiff reported doing slow but
steady progress with therapy (Tr. 162);

(17) On April 3, 2003, a therapist stated that plaintiff was
making excellent progress, had increased cervical range
of motion, increased right shoulder and arm range of
motion, and improved activity tolerance (Tr. 199);

(18) On May 16, 2003, plaintiff said that physical therapy
had improved her pain considerably (Tr. 155);

(19) On June 3, 2003, plaintiff applied for Social Security
Disability benefits (Tr. 100-02);

(20) On June 12, 2003, a therapist represented that
plaintiff continued to make excellent progress with
neck pain, demonstrated increased range of motion, and
improved activity tolerance with her neck, shoulders,
and right arm, and stated that plaintiff had started to
perform household chores without any major irritation
(Tr. 180);

(21) On August 14, 2003, a therapist wrote that plaintiff
demonstrated full extremity and spinal range of motion
without pain, continued increasing daily activities,
and was ready to begin a work hardening and
conditioning program (Tr. 524);

(22) On September 11, 2003, plaintiff reported that physical
therapy had improved her level of pain and she was
using pain medication only after physical therapy (Tr.
811);

(23) On October 8, 2003, plaintiff complained that physical
therapy was no longer improving her condition, and that

64

a specific therapist was helping but that the other therapists were not using the same technique (Tr. 806);

(24) On October 20, 2003, plaintiff reported that she had been without pain until she signed her name on papers when she arrived for physical therapy, and the therapist wrote that plaintiff was frustrated with change in her therapist and was resistant to increasing the use of her upper right extremity (Tr. 497);

(25) On November 12, 2003, plaintiff's treating physician observed that plaintiff's hand and elbow had functional ranges of motion, sensation was grossly in tact, motor tone and muscle stretch reflexes were intact, but plaintiff exaggerated her response to pain (Tr. 827-28);

(26) On January 14, 2004, plaintiff was moving in and out of the treatment room extremely well and although she was guarded, she appeared to have the ability to move her right arm without difficulty (Tr. 829-30);

(27) On February 25, 2004, plaintiff was doing better with Celebrex, her shoulder pain and symptoms had improved, and she was able to flex the shoulder a full 180 degrees upon distraction (Tr. 1230);

(28) On April 12, 2004, Dr. Egea noted that plaintiff reported the development of pain in her right elbow, shoulder, and forearm as a result of her overusing the right arm to compensate for pain in her left arm (which is merely his recitation of her theory), and the doctor also noted that she had a limited range of motion on the right and left side (Tr. 1014-18);

(29) On August 30, 2004, plaintiff complained that her pain in the right arm had not improved and she was unable to lift any weight but her doctor noted that "we spent 20 minutes discussing the research indicating the need for weight lifting to provide fiberblasts lines of stress to lay down collagen fiber. Patient seem[ed] poorly motivated to try PT [physical therapy] again" (Tr. 1270-71);

(30) On November 1, 2004, plaintiff expressed her wish to undergo right shoulder arthroscopic and labral treatment (Tr. 919-21);

65

(31) On November 8, 2004, plaintiff underwent arthroscopic
     surgery (Tr. 1160-61);

(32) On November 18, 2004, plaintiff was instructed to begin
     physical therapy (Tr. 923);

(33) On December 13, 2004, plaintiff's doctor wrote that her
     range of motion was typical for that point after
     surgery but observed that plaintiff had failed to go to
     physical therapy because of some vague symptoms on the
     right (Tr. 925);

(34) On March 4, 2005, plaintiff reported that her pain was
     increasing with physical therapy but upon examination
     plaintiff's station was normal, there was a decrease in
     tenderness and an increase in range of motion (Tr.
     987);

(35) On March 15, 2005, plaintiff's doctor reported that her
     shoulder motion was good and functional (Tr. 982); and

(36) On April 1, 2005, a therapist reported that plaintiff
     had not returned for physical therapy (Tr. 1185).

There are three administrative documents dealing with

plaintiff's functional capacity:

(1) On July 25, 2003, Janice Hendler, M.D., completed a
    Physical Residual Functional Capacity Assessment on
    plaintiff - projected to May 2004, and concluded in
    part that plaintiff could frequently lift 25 pounds;
    occasionally lift 50 pounds; sit for six hours; push
    and pull with limitations on her upper right side; and
    frequently climb, balance, stoop, kneel, crouch, but
    only occasionally crawl (Tr. 284-91);

(2) On May 16, 2005, Dr. Fernando Egea examined plaintiff
    and concluded in part that plaintiff could not reach
    above her shoulder level or use her shoulders in
    lifting and carrying and that she could not lift more
    than 10 pounds (Tr. 1273);[37] and

---

[37]The ALJ found that plaintiff retained the residual
functional capacity to perform sedentary work which requires the
following abilities: "lifting no more than 10 pounds at a time
and occasionally lifting or carrying articles like docket files,

66

(3) On August 15, 2005, Dr. Ronald Zipper concluded in part
     that plaintiff had 20% weakness of the right biceps
     (Tr. 1255).

Finally, the administrative record includes the testimony of

Daniel Girazadas, M.D., who testified via the telephone during

the supplemental hearing (Tr. 1322-30). After reviewing

plaintiff's medical records, the doctor opined that plaintiff

could occasionally lift 20 pounds; frequently lift ten pounds;

occasionally reach over shoulder height; frequently work from

floor to shoulder height; and frequently handle, finger and sense

with the right upper extremity (Tr. 1324).

In his decision, the ALJ found plaintiff had the Residual

Functional Capacity to lift, carry, push, and pull up to ten

pounds occasionally; nominal weights, less than five pounds,

frequently; and stand, walk, and/or sit a total of six hours in

an eight-hour workday (Tr. 25). The ALJ determined plaintiff had

no manipulative limitations, but her ability to push and pull

with her right arm was limited to nominal weights and that she

should not engage in overhead work or reach above shoulder height

with her right arm (Tr. 25-26). The ALJ found plaintiff could not

_____

ledgers, and small tools. Although a sedentary job is defined as
one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties. Jobs are
sedentary if walking and standing are required occasionally and
other sedentary criteria are met." 20 C.F.R. § 404.1567.
Therefore, Dr. Agea's stated limitations do not contradict those
ultimately found by the ALJ.

crawl or climb ladders, ropes, or scaffolds and that she should avoid concentrated exposure to airborne irritants (Tr. 26). In making these findings, the ALJ considered all the opinions of the treating and examining sources (Tr. 23). Therefore the ALJ generally agreed with plaintiff's treating physician, Dr. Egea, that plaintiff could perform sedentary work while at the same time disagreeing with his conclusion that plaintiff's pain rendered her unemployable (Tr. 25).

An ALJ may discredit a treating physician's opinion if the opinion is inconsistent with or contradicted by other evidence in the record. Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Here, the ALJ relied on Dr. Egea's opinion that plaintiff could perform sedentary work while at the same time discounting his opinion that plaintiff's pain caused her to be disabled. I agree with the ALJ's analysis. From my review of the record, Dr. Egea overstated the evidence as to plaintiff's pain and relied solely on her subjective complaints in that regard.

Because there are no functional restrictions in the medical records which are more restrictive than those found by the ALJ, this factor supports the ALJ's decision to discredit plaintiff's subjective complaints of disabling pain.

68

**B.    *CREDIBILITY CONCLUSION***

Summarizing:

• Plaintiff has worked at only three jobs her entire adult life;

• Plaintiff has worked a total of ten to 11 months her entire adult life;

• Plaintiff has earned just over $12,000.00 her entire adult life;

• Plaintiff suffered an injury at age 36-37, for which she claims she became disabled at age 38-39;

• Plaintiff had an initial and documented work-related injury to her <u>left</u> hand and wrist that somehow migrated to her right wrist, elbow and shoulder as a result of what she described as overuse;

• Plaintiff's medical records reflect no objective evidence as to the origin or the nature of her allegedly disability; and

• Plaintiff is someone about whom at least one of her treating physicians expressly concluded was exaggerating her symptoms, and others have expressed their suspicions of the same thing.

Based on these facts and all the other evidence in the record, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling pain are not credible. Therefore, plaintiff's motion for summary judgment on that basis will be denied.

**VII. *CREDIBILITY OF PLAINTIFF'S SON***

Plaintiff argues that the ALJ erred in finding the testimony of her son not credible.

69

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed.Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.  Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.  Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.  Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public

70

and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. <u>Sloan v. Astrue</u>, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." <u>Id</u>. quoting SSR 06-3p.

The courts have consistently criticized the Social Security Administration for failing to discuss third-party statements:

> Where proof of a disability depends substantially upon subjective evidence, . . . a credibility determination is a critical factor in the Secretary's decision. Thus, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983). <u>See</u> <u>also</u> <u>Andrews v. Schweiker</u>, 680 F.2d 559, 561 (8th Cir. 1982). In this case, the administrative law judge was, of course, free to disbelieve the testimony of Basinger, his wife, and the affidavits of others. <u>Isom v. Schweiker</u>, 711 F.2d 88, 89-90 (8th Cir. 1983); <u>Simonson v. Schweiker</u>, 699 F.2d 426, 429 (8th Cir. 1983). This, however, the administrative law judge did not do. Rather, the administrative law judge denied disability benefits based on the lack of objective medical evidence. Basinger should not have his claim denied simply because he failed to see a physician near the time that his insured status expired. The testimony indicated that Basinger had

rarely sought medical attention throughout his lifetime.
Indeed, his wife stated that she did not believe that
Basinger had ever been to a doctor until 1968. She
explained Basinger's failure to see a doctor between 1973
and 1980 as owing partly to stubbornness, and partly to
finances. A Social Security claimant should not be
disfavored because he cannot afford or is not accustomed to
seeking medical care on a regular basis. The failure to
seek medical attention may, however, be considered by the
administrative law judge in determining the claimant's
credibility.

The error in this case was the failure of the administrative
law judge to give adequate consideration to the objective
testimony presented by the two physicians and the subjective
testimony and affidavits of Basinger, his wife, and others.

We do not decide the question of whether this evidence was
sufficient to prove that Basinger was disabled within the
insured period. Before that determination is made, the
administrative law judge must judge the credibility of the
witnesses. If all of Basinger's evidence is to be given
credence, we believe that Basinger has at least met his
initial burden of showing that he could not return to his
former employment. We reverse the decision of the district
court and remand this case to the Secretary for further
consideration of Basinger's claim. On remand, the
administrative law judge should consider all of the relevant
objective and subjective evidence presented by the claimant,
and if any of the evidence is to be discredited, a specific
finding to that effect should be made.

Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir. 1984).

However, the fact that the courts have made this criticism

on a regular basis does not mean that in every case the failure

of an ALJ to analyze the credibility of third-party witnesses

remand is automatic. For example, in Young v. Apfel, 221 F.3d

1065 (8th Cir. 2000), the court held that the ALJ "implicitly"

evaluated the testimony of the claimant and her witnesses by

evaluating the inconsistencies between her statements and the

72

medical evidence.

> [B]ecause the same evidence also supports discounting the testimony of Young's husband, the ALJ's failure to give specific reasons for disregarding his testimony is inconsequential.  <u>See</u> <u>Lorenzen v. Chater</u>, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible).  Finally, we find that the ALJ did not discredit the statements of Young's friends merely on the grounds that they were not medical evidence; rather, the ALJ observed that the statements were devoid of specific information that could contradict the medical evidence regarding Young's capabilities during the relevant time period.

<u>Id</u>. at 1068-1069.

> <u>See also</u> <u>Carlson v. Chater</u>, 74 F.3d 869, 871 (8th Cir. 1996); <u>Bates v. Chater</u>, 54 F.3d 529, 533 (8th Cir. 1995).

In this case, plaintiff's son merely testified that he does most of the things that plaintiff testified she cannot do, such as washing dishes, making beds, ironing, vacuuming, sweeping, taking out the trash, and mowing the lawn.  The ALJ noted this testimony, and found both plaintiff's and her son's testimony not credible because the testimony was not supported by the overall record.

Although the ALJ did not specifically analyze the testimony of plaintiff's son separate from his analysis of plaintiff's testimony, that does not automatically require a reversal or a remand.  Because the same evidence discussed above which can be used to discount the subjective testimony of plaintiff also supports discounting the testimony of plaintiff's son, the ALJ's

73

failure to give specific reasons for disregarding the son's testimony is inconsequential. Furthermore, even if the son were found credible, i.e., it is true that he does all of these household tasks for plaintiff, it does not follow that he does these things because plaintiff's impairment prevents her from doing them. The medical records, discussed at great length above, establish that if plaintiff does not do these household chores, it is her choice rather than her impairment that results in her son's having to do them for her.

## VIII. HYPOTHETICAL

Plaintiff argues that the ALJ erred in failing to correctly frame the hypothetical question that led the vocational expert to conclude that plaintiff could perform sedentary work.

A hypothetical question posed to a vocational expert must include all credible impairments and limitations. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). A hypothetical relied on by the ALJ need not include impairments the ALJ has found not credible. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Stormo v. Barnhart, 377 F.3d 801, 808-09 (8th Cir. 2004).

In this case, the hypothetical relied on by the ALJ included all of the credible impairments, i.e., all of the impairments supported by the record as a whole. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

74

## IX.  DUE PROCESS

Finally, plaintiff argues that the Social Security Administration violated its regulations and plaintiff's due process rights by conducting administrative hearings before two different administrative law judges.

It is true that there were two administrative hearings and each was conducted by a different judge: ALJ Stubbs presiding over the March 21, 2006, hearing and ALJ Bock presiding over the June 5, 2006, hearing.  Plaintiff characterizes this procedure as a "bait and switch," but I fail to understand the analogy or see any prejudice, much less a due process violation, to plaintiff. Plaintiff appeared at both hearings with counsel and had an opportunity to present evidence at both, and the evidence was subsequently reviewed and analyzed by Judge Bock in reaching his decision. See <u>Hepp v. Astrue</u>, 511 F.3d 798, 804-05 (8th Cir. 2008).

The Agency points out that its regulations allow for reassignment of cases and that its internal policies provide that when an ALJ who conducted a hearing is unavailable for reasons of death, retirement, resignation, illness, or other cause, the Chief ALJ may reassign the case to another ALJ for processing.[38] Although there is no explanation as to why the case was shifted from Judge Stubbs to Judge Bock, there is nothing in the record

---

[38]Defendant's brief, pages 17-18.

75

to suggest that the reassignment was done to improperly influence the outcome of plaintiff's application. Plaintiff has pointed to no harm from the use of two judges other than (1) ALJ Bock did not hear all of the testimony of the Plaintiff nor did he hear any of the testimony of Plaintiff's son". Plaintiff has failed to explain (1) why she chose not to testify again about the matters testified to in front of Stubbs, if it was unacceptable to plaintiff to have Judge Bock consider that testimony from the written record (and considering she was represented by counsel who could have elicited that testimony), (2) how she was denied a "meaningful opportunity to be heard" and (3) what prejudice she suffered as a result of two judges being involved in her case.

As defendant points out, the ALJ reviewed the tape of the first hearing, thereby hearing both plaintiff and her son testify; and the Eighth Circuit has held that in-person cross-examination would not significantly increase the accuracy of determining a witness's credibility over that of a telephone cross-examination, which is very similar to the ALJ listening to testimony from a tape (as opposed to over a telephone). See Hepp v. Astrue, 511 F.3d 798, 805-06 (8th Cir. 2008). Plaintiff has failed to explain how in-person testimony would have resulted in a finding by any ALJ that plaintiff's subjective complaints of disabling pain are credible; and given the significant amount of

Case 4:08-cv-00430-REL   Document 22   Filed 09/03/09   Page 76 of 77

evidence to the contrary, I cannot see how that would be the case. There simply is no due process violation here.

## X.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 3, 2009

77